Andrew R. Meyers, d/b/a General Hardware Company and Armglo Company v. Commissioner. Andrew R. Meyers and Irene W. Meyers, d/b/a General Hardware Company and Armglo Company v. Commissioner.
Meyers v. Commissioner
Docket Nos. 43460, 43461.
United States Tax Court
T.C. Memo 1955-312; 1955 Tax Ct. Memo LEXIS 24; 14 T.C.M. (CCH) 1219; T.C.M. (RIA) 55312; November 29, 1955
*24 1. The amount of unreported net income of petitioners for each of the years 1942 through 1949 determined. 2. Held: A part of the deficiency for each of the years 1942 through 1949 was due to fraud with intent to evade tax. Bruno V. Bitker, Esq., 208 East Wisconsin Avenue, Milwaukee, Wis., and Gerald J. Kahn, Esq., for the petitioners. Warren C. Seieroe, Esq., and Harold H. Hart, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax of petitioners and additions thereto for fraud and for substantial underestimation of estimated tax for years and in amounts as follows: Addition for
Substantial Under-
Addition
estimation of
Docket Number
Year
Deficiency
for Fraud
Estimated Tax
43460
1942
$ 6,564.75
$ 3,282.38
1943
31,807.42
16,752.52
43461
1944
79,284.71
45,634.24
1945
101,593.03
54,442.13
1946
122,850.65
66,995.56
1947
10,121.82
5,060.91
$319.31
1948
24,269.54
12,134.77
1949
6,309.32
3,154.66
*25 Various adjustments made by respondent in the statutory notice of deficiency are not contested. Certain issues raised by the pleadings have been resolved by stipulations of the parties. In addition, respondent has conceded error as to certain adjustments. The issues remaining for decision are: (1) Whether respondent correctly determined the amount of unreported income of petitioners in each of the taxable years. (2) Whether any part of any deficiencies determined by respondent for the years 1942 through 1949 are due to fraud with intent to evade tax. (3) Whether assessment and collection of deficiencies and additions to tax for the years 1942, 1943 and 1944 are barred by the statute of limitations. (4) Whether the forgiveness provisions of Section 6 of the Current Tax Payment Act of 1943 are applicable to either of the years 1942 or 1943. (5) Whether respondent's imposition of an addition to tax for substantial underestimation of estimated income for the year 1947 is justified. (6) Whether petitioners are to be allowed a deduction for 1949 for medical expenses. (7) Whether petitioners sustained a net operating loss during the taxable year 1948 to be carried over to *26 the taxable year 1949. Findings of Fact The stipulations of fact filed by the parties with exhibits attached are adopted and, by this reference, made a part hereof. The petitioners are Andrew R. Meyers (hereinafter referred to as petitioner) and his wife, Irene W. Meyers (hereinafter sometimes called Irene), who reside at Whitefish Bay, Wisconsin. Petitioner filed individual income tax returns for the years 1942 through 1944 with the then collector of internal revenue for the district of Wisconsin. Petitioner and Irene filed joint income tax returns for the years 1945 through 1949 with the same collector. Irene is party to these proceedings solely by reason of having filed such joint returns. Petitioner, Andrew R. Meyers (hereinafter referred to as petitioner), was born in 1900. His schooling was limited to high school and night school. After leaving high school he worked as an office accountant. He became a certified public accountant, although he has never engaged in the practice of public accounting. In 1933, petitioner acquired the assets of a small defunct manufacturing business and embarked upon a small hardware and grinder manufacturing venture. He operated as a sole *27 proprietor under the trade names of General Hardware Company and Armglo Company (both hereinafter referred to as General Hardware). During the taxable years 1942 through 1949, petitioner conducted his operations in a building in Milwaukee, Wisconsin, which building was about 75 feet wide and 100 feet deep, having two floors and a basement. Manufacturing activities were confined to the first floor and a part of the second floor. The remainder of the second floor was occupied as an office. The basement was utilized mainly for storage. About one-fourth of the first floor area was occupied by machinery. Petitioner conducted his business originally as a "one-man operation." He was salesman, bookkeeper, buyer, designer, production man and supervisor. He devoted all of his working hours to the business. He took no vacations. He had no other business interests and no other sources of business receipts. The number of people employed by General Hardware in the office and plant varied between 12 and 44. There was a shortage of labor and general help during the years in question. During the period 1942 through 1949, the principal products manufactured by General Hardware were grinders, lawn *28 brooms (also known as lawn rakes) and hose reels. A small number of welding machines were also manufactured in 1942, 1943 and 1947, and it was this phase of petitioner's operations that was identified by the trade name "Armglo Company." In 1942 and 1943 the manufacture of welding machines did not constitute more than one percent of production. In 1947 only three welding machines were made and sold. Both hand and power grinders, which are devices for sharpening tools and implements used by farmers and carpenters and in home workshops, were produced throughout the period 1942 through 1949. The basic materials going into the composition of these grinders were steel, castings, stampings and abrasives. By interchanging numbers and sizes of basic materials the company was able to produce a number of different types of grinders. Hose reels were designed for use by homeowners for storing garden hose. The principal line of hose reels of General Hardware was known as "HR 149." Hose reels were produced from 1942 through the first quarter of 1947. They were discontinued because of excessive production costs, particularly labor and material. Hose reels were composed entirely of steel. The chief *29 line of hose reels produced by General Hardware was 36 inches high and 14 1/2 inches wide and each unit required ten pounds of steel in its manufacture. At times General Hardware also produced such items as grass slicers and dandelion diggers which contained only steel parts. Lawn brooms made by General Hardware were used chiefly by landscapers, gardeners and homeowners. A lawn broom consists of a wooden handle, stampings and wire. The stamping and wire are made wholly of steel. Each dozen lawn brooms required eight pounds of spring steel wire and 9 1/2 pounds of steel for stampings. Until 1946 General Hardware made its own stampings for lawn brooms. In 1946 changes were made in the style of the lawn broom and thereafter stampings were purchased from an outside supplier. Under date of November 19, 1941, petitioner entered into a contract with Sears, Roebuck & Co. wherein it was agreed that General Hardware would deliver inter alia 10,000 wire hose reels, 40,000 Fulton hose reels, 12,000 Craftsman hose reels and 12,000 dozen lawn rakes at a specified price, between January 1, 1942 and August 1, 1942. The total contract price for all articles, including the foregoing, was $88,875.00. *30 This contract was only partially performed. General Hardware also sold hose reels to other customers during the entire year of 1942. Petitioner's estimate of General Hardware's approximate sales of hose reels and miscellaneous garden tools during the years 1942 through 1947 is as follows: Year
Estimated Sales
1942
$ 65,000.00
1943
85,000.00
1944
150,000.00
1945
Slightly less than
150,000.00
1946
200,000.00
1947
55,000.00
Petitioner also estimated that General Hardware's sales of lawn brooms during the years 1942 through 1947 were approximately as follows: Year
Estimated Sales
1942
$66,600.00
1943
44,700.00
1944
2,600.00
1945
None
1946
60,000.00
1947
11,500.00
General Hardware sold its finished products to jobbers, mail-order houses and chain stores. No sales were made at the retail level. Its customers were established business firms having credit ratings. Credit was extended, payment being due on or before the tenth day of the succeeding month. Billings were always on regular General Hardware invoices and shipping records were maintained. Payments were received from customers in the form of checks. The books and *31 records of General Hardware were kept on a cash receipts and disbursement basis and petitioner's income tax returns for the years 1942 through 1946 were filed on such basis. In 1947, adjustments relating to accounts receivable and payable at the end of 1946 and the beginning of 1947 were made by respondent so as to place petitioner on an accrual basis of reporting, and petitioner's returns for the years 1947 through 1949 were filed on such basis. General Hardware had a business account at the American State Bank (hereinafter referred to as the Bank) in Milwaukee. In the usual course of events, sales were entered in a cash receipts journal on the basis of deposits made in the General Hardware account at the Bank. A record of deposits was made on duplicate deposit slips. Disbursements were recorded in a cash disbursements journal on the basis of notations appearing on the stubs of the General Hardware checkbook. Postings were made from the journals to the appropriate general ledger accounts. Entries on the books were made either by petitioner or one of the two office girls acting under his general supervision. Neither of the girls had any bookkeeping training other than that given *32 to them by petitioner. During 1942 petitioner deposited business receipts in the amount of $14,110.54 in the bank account of General Hardware which were not reflected on duplicate deposit slips and did not appear on the books and tax return. All sales and purchase invoices, shipping records and other transfer records of General Hardware for years prior to 1948 were stored in the factory part of the building and were destroyed by a fire at the plant caused by spontaneous combustion in February of 1948. The cash receipts and cash disbursements journals and the general ledger of the company were kept in a safe in the office and consequently were not so destroyed. General Hardware published list prices at which it sold its products. All sales during the taxable years 1942 through 1949 were made at list price or at list price less quantity or trade discounts. The amount of the trade discount depended on the business classification of the customer. Beginning in 1942 there was a growing scarcity of steel, which continued through 1949. This scarcity of steel was attributable to wartime and postwar conditions. The shortage of steel was of general knowledge among members of the hardware *33 and steel fabricating industries. Without steel, General Hardware would have been unable to continue its manufacturing operations. The sales of steel were controlled by Government priorities. Some grades were unobtainable by purchasers without priorities. The ability to purchase steel depended largely upon the type of priority held by the purchaser, and with proper prorities some steel could be obtained. Petitioner had some type of priority during each of the years in question, but despite this fact he was unable to obtain steel in sufficient quantities from his regular suppliers to meet his manufacturing needs. He, therefore, purchased some steel in the years 1944 through 1946 outside of regular channels in the so-called "black market." The largest amount of such purchases was made in 1946. This practice was continued into 1947 to a lesser degree in the "gray market." For such purchases, payment was required to be made in cash or its equivalent, such as U.S. Treasury negotiable coupon bonds. Petitioner employed both forms of payment. In those instances when the face value of the bonds so used by petitioner to acquire steel was in excess of the purchase price, he would often be given *34 the detached interest coupons equal to such excess. When the price of steel was in excess of the face amount of the bonds, petitioner would pay the difference in cash. In 1943, petitioner and Irene opened a joint checking account with the Bank, separate from the account of General Hardware. The initial deposit was of an out-of-town check in the amount of $4,874.88. Thereafter, petitioner deposited large amounts of business receipts in this account, which receipts were not reflected on the books and records of General Hardware or reported in the petitioner's income tax returns. Such deposits of unrecorded and unreported business receipts aggregated the following amounts in the years indicated: Year
Amount
1943
$ 41,399.63
1944
93,141.57
1945
112,375.86
1946
141,104.47
1947
36,324.81
1948
21,114.35
1949
10,043.28
There was an additional deposit to this "supplemental account" on May 10, 1948, in the amount of $25,000.00 in currency. During the years 1943 to 1949, inclusive, petitioner made withdrawals from this joint account in the amounts indicated and for the purposes specified: 1943
Investment in Common Stock
$ 2,154.59
Payment of Mortgage
9,800.00
Advance to General Hardware Company
12,500.00
Purchase of Series "E" Bonds
1,537.50
Transferred to Wife's Personal Account
350.00
For Unidentified Purposes
689.66
Total Withdrawals in 1943
$ 27,031.75
1944
Purchase of Treasury Coupon Bonds
$ 83,000.00
Purchase of two single Premium Life In-
surance Policies
8,325.90
Advance to General Hardware Company
5,000.00
Purchase of Series "E" Bond
750.00
For Unidentified Purposes
8,022.00
Total Withdrawals in 1944
$105,097.90
1945
Purchase of Treasury Coupon Bonds
$ 88,000.00
Loaned to Mr. Wollman
3,000.00
Purchase of Real Estate
6,300.00
Transferred to Wife's Personal Account
1,388.44
For Unidentified Purposes
789.50
Total Withdrawals in 1945
$ 99,477.94
1946
Purchase of Treasury Coupon Bonds
$127,666.83
Purchase of Real Estate
3,500.00
Construction of Personal Residence
89,29
Transferred to Wife's Personal Account
5,167.77
For Unidentified Purposes
25,468.38
Total Withdrawals in 1946
$161,892.27 *
1947
Construction of Personal Residence
$ 43,905.57
Purchase of Buick Automobile
1,759.03
For Unidentified Purposes
25,034.71
Total Withdrawals in 1947
$ 70,699.31 *
1948
Construction of Personal Residence
$ 40,107.04
Advance to General Hardware Company
20,000.00
Loaned to Ernest and Irene Jackson
15,000.00
Transferred to Wife's Personal Account
5,185.57
For Unidentified Purposes
4,243.07
Total Withdrawals in 1948
$ 84,535.68 *
1949
Construction of Personal Residence
$ 4,600.00
Advance to General Hardware Company
1,000.00
Investment in Common Stock
3,037.50
Loaned to Joseph Warczynski
3,000.00
Transferred to Wife's Personal Account
5,500.00
For Unidentified Purposes
2,001.00
Total Withdrawals in 1949
$ 19,138.50
*35 Irene maintained her personal account at the Bay View State Bank. Petitioner purchased the following amounts of United States Treasury coupon bonds (face value) during the years 1944, 1945 and 1946: Year
Amount
1944
$ 83,000.00
1945
88,000.00
1946
125,000.00 Petitioner paid during 1946 an additional $2,666.83 to the Bank in connection with the purchase of United States Treasury coupon bonds. On May 16, 1945, petitioner made application for the purchase of United States Treasury coupon bonds in the amount of $32,500 through the American State Bank, Milwaukee, Wisconsin. The application was made in the name of "John Schultz" and the petitioner accepted delivery of the bonds and signed the receipt in the name of John Schultz. On the following dates petitioner made deposits to his checking accounts of coupons from United States Treasury coupon bonds. The dates, amounts and accounts to which deposited *36 are indicated below: Bank Account
Value of
Date
to Which Deposited
Coupons Deposited
6-29-44
Bay View State Bank
$ 62.50
12-29-44
American State Bank
569.91
$ 632.41
3-16-45
American State Bank
$ 818.53
9-15-45
American State Bank
1,093.75
$ 1,912.28
3-26-46
American State Bank
$1,031.25
6-20-46
American State Bank
1,705.42
$ 2,736.67
8-29-47
American State Bank
$2,718.75
9-19-47
American State Bank
1,031.25 *
$ 3,750.00
1-14-48
American State Bank
$2,718.75
6- 4-48
American State Bank
1,031.25
6-18-48
American State Bank
2,718.25
9-29-48
American State Bank
1,031.25
12-17-48
American State Bank
2,718.75
$10,218.25
12-13-49
American State Bank
$ 531.25
12-13-49
American State Bank
531.25
12-13-49
American State Bank
1,343.75
12-16-49
American State Bank
1,343.75
12-16-49
American State Bank
1,375.00
12-16-49
American State Bank
1,375.00
$ 6,500.00
There was entered on the cash disbursements journal of General Hardware all purchases of raw materials except for the steel purchases outside *37 the ordinary channels of commerce. General Hardware maintained twelve material accounts on its general ledger, identifying the basic materials going into its products. These material accounts and the purchases reflected therein for the years 1942 through 1949 were as follows: AMOUNT PURCHASED PER BOOKS
1942
1943
1944
1945
Castings
$ 43,332.05
$ 65,138.60
$109,713.44
$ 78,846.20
Abrasives
25,693.40
48,632.22
82,694.50
75,054.58
Stampings
7,258.60
2,893.10
11,476.94
27,117.12
Screw Mchn.
Products
937.77
6,360.77
23,514.78
18,972.64
Misc.
Materials
13,572.93
10,965.09
35,926.37
41,323.49
Wood
Handles
10,287.26
6,747.72
426.11
5.00
Packing
Mat'ls.
11,041.90
10,826.25
16,337.59
10,599.87
Enamel &
Plating
10,685.58
4,065.38
4,489.05
5,978.73
Elec.
Control
3,936.92
41.25
Elec.
Mat'ls.
1,980.25
340.22
Copper
3,218.80
2,527.35
2,354.40
539.77
Steel
62,227.40
55,257.11
23,264.05
5,547.79
Totals
$194,172.86
$213,795.06
$310,179.23
$262,985.19
AMOUNT PURCHASED PER BOOKS
1946
1947
1948
1949
Castings
$106,155.25
$ 56,987.60
$14,314.33
$12,712.63
Abrasives
103,515.69
51,942.23
29,136.06
29,064.96
Stampings
44,990.26
15,024.82
10,079.32
8,826.00
Screw Mchn.
Products
16,398.01
5,849.30
4,421.14
1,470.10
Misc.
Materials
49,728.33
21,492.74
4,541.93
6,104.52
Wood
Handles
9,522.75
3,207.64
2,558.99
2,773.51
Packing
Mat'ls.
11,762.47
8,118.03
3,530.32
4,981.77
Enamel &
Plating
6,617.41
3,953.45
4,115.63
2,213.83
Elec.
Control
3,88
Elec.
Mat'ls.
418.70
Copper
387.64
979.68
1,066.26
533.33
Steel
16,548.38
13,692.29
610.61
3,190.32
Totals
$365,626.19
$181,251.66
$74,793.29
$71,871.06
*38 The going warehouse price per hundred-weight of various kinds of steel used by petitioner during the years 1942 through 1947 was as follows: Cold Rolled
Hot Rolled
Cold Rolled
Cold Rolled
Year
Bar Steel
Strip Steel
Strip Steel
Sheet Steel
1942-1944
$4.30-$4.65
$3.90
$5.65-$6.10
$4.00
1945
4.40- 4.75
3.90
5.65- 6.10
4.00
1946
4.75- 5.10
4.25
5.90- 6.35
4.225
1947
5.60- 6.65
4.60- 4.90
6.15- 7.40
4.55- 4.65
The ratio of cost of steel used to selling price as it related to each unit of hose reels, lawn brooms, and grinders sold by General Hardware was about 56 percent, 31 percent and 5 percent, respectively. In computing cost of goods sold on his tax returns, petitioner used inventory figures per books of General Hardware as at December 31, of each of the years 1941 through 1949, as follows: Year Ending
Stated
December 31
Inventory
1941
$ None
1942
6,417.62
1943
8,267.14
1944
6,981.58
1945
6,786.50
1946
8,980.72
1947
6,743.30
1948
3,493.24
1949
4,552.31
Financial statements of General Hardware in form of balance sheets as of December 31 of each of the years 1941, 1942 and 1943 were submitted *39 to the Bank by petitioner on February 14, 1942, January 11, 1943, and February 14, 1944, respectively, for the purpose of obtaining a line of credit. On the basis thereof, General Hardware was allowed to maintain an open line of credit of approximately $25,000.00. The value of the inventory appearing thereon, based on physical count plus estimation of large amounts of certain kinds of material, were $63,832.45, $60,969.06, and $39,267.14 as at December 31 of each of the years 1941, 1942 and 1943. All such statements were sworn to and subscribed by petitioner. Books and records of the General Hardware were maintained under the supervision of the petitioner. In normal accounting procedure all receipts should have been entered in the Cash Receipts Journal and posted to the individual accounts receivable. Monthly totals of the Cash Receipts Journal were posted to a ledger account designated as Sales Receipts. The total of the postings to the Sales Receipts ledger was shown on the petitioner's income tax returns as gross receipts. Business receipts as shown on petitioner's records and income tax returns were deposited in the business account of General Hardware maintained with the Bank. *40 During 1942 petitioner received various payments for merchandise which were not recorded in the Cash Receipts Journal and not reflected in gross receipts as shown on his 1942 income tax return. The above receipts, which totaled $14,110.54, were deposited to the business account. During the years 1943 through 1949, petitioner on frequent occasions instructed his bookkeepers to omit certain receipts from the Cash Receipts Journal, the effect of which omission was to understate gross receipts on petitioner's income tax returns. The business receipts thus unreported were deposited to the aforementioned joint, or supplemental, account maintained by petitioner and Irene at the Bank. Petitioner's income tax returns for the years 1942 to 1946, inclusive, reported as gross business receipts only the amounts shown in the Cash Receipts Journal of the General Hardware. Petitioner's income tax returns for the years 1947, 1948 and 1949 reported as gross business receipts the amounts shown in the Cash Receipts Journal of General Hardware after adjustments were made for outstanding accounts receivable and accounts payable at the beginning and ending of each of the years. Petitioner also maintained *41 a journal known as the "Sales Billed Journal." Total sales as reflected to be for the years 1947 through 1949 did not agree with sales as shown on petitioner's tax returns for those years. For each of the years 1942 through 1947, the gross receipts of General Hardware, as adjusted, for net accounts payable and receivable accounts, were as follows: Year
Gross Receipts
1942
$320,787.75
1943
378,513.93
1944
525,740.41
1945
514,197.93
1946
677,627.71
1947
312,176.79 The gross receipts of General Hardware for the years 1948 and 1949 were $188,030.39 and $167,114.11, respectively. During 1948, petitioner and Irene sustained a nondeductible loss of $912.56 on the sale of their residence and certain furnishings. In 1948, also, they expended approximately $7,796.10 for additional household furnishings. During the years 1945 through 1949, petitioner and Irene expended the following amounts in connection with the purchase of certain land in Whitefish Bay, Wisconsin, and the construction thereon of a personal residence: 1945
$ 6,300.00
1946
4,570.13
1947
47,041.17
1948
41,936.96
1949
4,912.15
Petitioner made annual expenditures in payment *42 of Federal income taxes and life insurance premiums in the years 1942 through 1949, as follows: Federal
Life Insurance
Year
Income Tax
Premium
1942
$ 150.33
$1,041.68
1943
2,660.00
1,584.45
1944
4,394.39
9,750.93
1945
7,244.65
1,743.49
1946
10,158.67
1,007.24
1947
2,181.27
159,41
1948
30,124.32
512,38
1949
(1,720.63)
520.99
In connection with his operations in violation of Federal wartime regulations, petitioner was prosecuted at the instance of the War Production Board, pleaded guilty, was fined $5,000.00 and placed on probation for one year. Notwithstanding this action, petitioner continued to manufacture the prohibited items. In addition to the above prosecution, petitioner was indicted on March 6, 1952, for fraudulent evasion of income taxes for the years 1945 to 1949. Petitioner pleaded nolo contendere to the count for the year 1945, was found guilty in Federal District Court (Wisconsin) and sentenced to three years' confinement in a Federal correction institution. This sentence was subsequently reduced to 18 months. On the basis of the entire record, we make the following findings as ultimate conclusions of fact: Petitioner *43 made purchases of steel on the "black market" during 1944, 1945 and 1946, and on the "gray market" in 1947, in addition to those purchases recorded on the books and records of General Hardware in the amounts of $38,611.00, $56,882.10, $76,133.00, and $18,776.55, respectively. General Hardware had closing inventories as at December 31, 1941, 1942 and 1943 in the amounts of $40,916.28, $36,367.62 and $20,666.67, respectively. Petitioner did not report taxable income received upon the redemption of United States Series "E" bonds in 1946 and 1948 in the amount of $65.00 and $75.00 respectively. A part of the deficiency for each of the taxable years 1942 through 1949 was due to fraud with intent to evade tax. The returns for the taxable years 1942 through 1949 were false and fraudulent with intent to evade tax. Opinion VAN FOSSAN, Judge: The first issue to be resolved is whether respondent correctly determined the amount of unreported income of petitioner for each of the taxable years before us. Such determination reflects respondent's contention that petitioner received unreported taxable income during these years from three different sources, namely, business income of General *44 Hardware, interest income from bearer coupon bonds of the United States Treasury, and interest income from Series "E" bonds. With regard to the first source listed above, petitioner admits that, in each of the years before us, income in varying and substantial amounts received by General Hardware in payment for merchandise which it sold was not properly recorded on the books thereof nor included in total business receipts reported on his income tax returns. Further, the parties differ materially on the amounts of such unreported receipts only as to the years 1943 and 1948. For the year 1943, respondent contends the business receipts of General Hardware unreported by petitioner amounted to $46,274.88. Petitioner admits to $41,399.63 of such receipts. The difference of $4,874.88, it appears, represents the initial deposit made by petitioner to open the so-called "supplemental" or joint account of himself and Irene at the Bank. The parties have stipulated that the amount in dispute represented the proceeds of one check drawn on a bank located in other than Milwaukee. Respondent has determined and here maintains that the amount of the foregoing check constitutes a part of petitioner's *45 1943 income. Petitioner urges on brief, that, although he is unable to remember precisely of what the deposited amount consisted, he should not, in view of the passing of so long a period of time, be penalized for his deficiency in memory and that he firmly believes the deposit to be of a non-income item. Such plea, however, while having a bearing upon the question of actual fraud, of. Delone v. Commissioner, 100 Fed. (2d) 507, 508, 510, may not take the place of, nor be deemed a valid substitute for, creditable probative evidence necessary to overcome respondent's determination as to the status of the deposit. We, thus, have no alternative to concluding that the deposit in question was of income. With respect to the year 1948, petitioner admits unreported receipts in the total sum of $21,114.35, whereas respondent contends the unreported receipts of petitioner in that year aggregated $46,114.35, or an additional $25,000.00, which amount was a deposit of currency to the joint account of petitioner and Irene on May 10, 1948. Petitioner would have us believe that such deposit did not represent additional business receipts, but was merely a redeposit of funds previously *46 withdrawn during 1946 and 1947, to create a fund with which to pay an anticipated additional income tax assessment for 1947. In this connection petitioner points to the fact that the deposit was entirely of cash while he always dealt with established business firms which always paid by check. But, it does not logically follow that the amount in dispute did not in fact represent business receipts, petitioner to the contrary notwithstanding. For aught that is shown, such sum may very well have been the proceeds of checks received for goods sold by General Hardware, and previously cashed. Moreover, petitioner has failed to explain away the pertinent question of why the funds were so withdrawn, if, in fact, they were, only to be redeposited. Finally, no satisfactory explanation is offered of the repository of such a fund during the period of its alleged accumulation and prior to its deposit in the Bank. Accordingly, respondent is sustained as to this item. The status of unreported receipts admittedly received in each of the years before us is the next question, that is to say, whether all such receipts properly represent additional taxable net income to the petitioner. Respondent has *47 so determined. In arriving at his determination, respondent has accepted as correct the figures appearing on the books and records of General Hardware and in petitioner's tax returns for cost of goods sold. Petitioner, however, claims that such figures were grossly understated in that they did not reflect certain purchases by him of "black market" steel nor proper inventories ascertained by actual physical count. In our opinion the evidence in the instant record, when considered in its entirety, admits of no other logical inference than that petitioner did, in fact, make additional purchases of steel on the "black market" during 1944, 1945 and 1946, and on the "gray market" during part of 1947. This being true, the amount so expended by petitioner should properly be reflected in the cost of goods sold for those years. Cf. Lela Sullenger, 11 T.C. 1076. There is, however, an absence of specific evidence from which the exact amount thereof can be conclusively determined. Therefore, having done the best we can with the evidence at hand, we have concluded and so found as a fact that petitioner made such purchases in the "black market" during 1944, 1945 and 1946, and on *48 the "gray market" in 1947 in the amounts of $38,611.00, $56,882.00, $76,133.00, and $18,777.00, respectively. Cohan v. Commissioner, 39 Fed. (2d) 54. With respect to the years 1942 and 1943, the evidence is wholly insufficient to establish purchases of steel in such years in excess of those recorded. Regarding the matter of inventories, petitioner has introduced evidence in the form of balance sheets, prepared in connection with an application for an open line of credit, tending to indicate that General Hardware had closing inventories as at December 31, 1941, 1942 and 1943, substantially in excess of those recorded on its books and records or reported in petitioner's tax returns. The inventories thus appearing, we have found, were obtained by actual physical count plus estimation of large amounts of certain materials. This latter fact and the purpose for which the balance sheets were prepared render the accuracy thereof suspect. However, that General Hardware had, at all times material, an inventory of sizable proportions is evidenced by the testimony of various witnesses to the effect that all available space in the plant of General Hardware was used for storage of *49 steel inventory. Therefore, after considering all the evidence and the inferences properly to be drawn therefrom, we have determined and so found as a fact that General Hardware had closing inventories as at December 31, 1941, 1942 and 1943, in amounts of $40,916.28, $36,367.62, and $20,666.67, respectively. The next item in controversy is the actual cost of materials used in products sold in 1948 and 1949. Here again, respondent would accept as correct the costs recorded in the books of General Hardware. Petitioner, again proposing to capitalize his own failure to keep proper books, claims that such costs were substantially understated, and has presented the testimony of a certified public accountant that his analysis of General Hardware's sales and computation of the costs of materials necessary to manufacture the articles sold indicates the costs of such materials to have been in excess of those recorded in the books of account. Such analysis, however, is grounded upon information supplied by petitioner and no reason appears for accepting it as being more accurate than the figures appearing on General Hardware's books of original entry and reflected in petitioner's tax returns. *50 Moreover, the conclusions reached therein are in part at variance with petitioner's own testimony as well as with previous analyses submitted to respondent by the same accountant during the investigatory stages of this case. Accordingly, respondent is sustained as to this point. The next question is whether petitioner received, either constructively or actually, interest income in the amount of the coupons maturing on the United States Treasury coupon bonds purchased by him during 1944 through 1946, in the total face amount of $296,000, as determined by respondent. Respondent's determination is predicated upon the assumption that petitioner retained ownership of the foregoing bonds and coupons attached thereto through at least December 31, 1949. We have found herein that certain of the bonds were used by petitioner in the acquisition of "black market" steel in each of the years 1944, 1945, 1946 and 1947. This fact, however, is not conclusive, since we have also found that, usually, coupons were detached therefrom and given back to petitioner in the amount of the difference between the face value of the bonds and the purchase price of the steel thus acquired. But the coupons detached *51 from the bonds purchased by petitioner and so given back to him may not be properly considered in the same category with change inasmuch as he was given back no more than he already possessed. On occasion, it appears, petitioner was given coupons apparently detached from bonds other than those purchased by him, but there is no evidence of the value to be ascribed thereto. Nor is there evidence of how many, if any, of the coupons remained undetached and were used by petitioner as part of the purchase price. Bearing all these factors in mind, we have determined from all of the evidence touching upon the point that petitioner derived interest income, either constructively or actually, during the years 1944 through 1949, in amounts, as follows: 1944
$ 632.14
1945
1,912.28
1946
2,736.67
1947
3,750.00
1948
7,400.00
1949
6,500.00
The foregoing will be reflected in the Rule 50 recomputation consequent hereon. Respondent determined that petitioner understated interest income from Series "E" bonds in 1946 and 1948 by the amounts of $65.00 and $75.00, respectively. Petitioner has offered no evidence or argument to refute the correctness of the determination. Respondent's *52 action in this regard is, therefore, sustained. Next is the question of fraud. The pertinent statutory provisions are Section 293(b) [1] and Section 276(a) [2] of the 1939 Code. Our findings above that a part of the deficiency for each of the years involved was due to fraud with intent to evade tax and that the returns were false and fraudulent with intent to evade tax are dispositive of this question. Such findings reflect our conviction that respondent, upon whom the burden is placed by statute, see Section 1112, Internal Revenue Code of 1939, has proven by clear and convincing evidence the existence of the requisite intent on the part of the taxpayer at the time each of the returns was filed to evade payment of taxes legally due. Little more need be said. In our opinion, the record is replete with evidence which is clearly indicative of fraud as to each year. See Spies v. United States, 317 U.S. 492. Consequently, we so hold. *53 Our finding as to fraud effectively answers in the negative and resolves in respondent's favor two other questions posed herein, that is, whether the years 1942 through 1944 are barred by the statute of limitations and whether the forgiveness provisions of Section 6 of the Current Tax Payment Act of 1943 are applicable to either of the taxable years 1942 and 1943. The next question, which involves the propriety of respondent's imposition of an addition to tax for substantial underestimation of estimated income for the year 1947, will be disposed of in the Rule 50 recomputation. That is to say, if in such recomputation it appears that petitioner did, in fact, underestimate his estimated income for 1947, within the meaning of Section 294(d)(2) of the Internal Revenue Code of 1939, [3] then and in that event the addition to tax provided therein will be assessed and collected. *54 In his petition, petitioner assigns as error respondent's disallowance of a deduction for certain medical expenses for the year 1949. There appears to be no dispute as to the payment of such expenses or the aggregate amount thereof. The only question is how much of this agreed sum is properly deductible as being in excess of five percent of petitioner's gross income for 1949. See Section 23(x), Internal Revenue Code of 1939. Being dependent upon our holdings herein, this question will be resolved in the Rule 50 recomputation. Likewise, the question of whether petitioner is entitled to a deduction in 1949 for a net operating loss sustained in 1948, which question is dependent upon our determination herein of petitioner's net income for 1948, will also be thus resolved. Decisions will be entered under Rule 50. Footnotes
*. While the total amount of withdrawals appears as orally stipulated by the parties, there appears to be an unexplained discrepancy in the breakdown between the amounts appearing in the transcript and the amounts appearing herein necessary to make such total.↩
*. Omitted in transcript but agreed to on brief by the parties.↩
1. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, * * *. ↩
2. SEC. 276. SAME - EXCEPTIONS. (a) False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.↩
3. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. * * *
(d) Estimated Tax. - * * *
(2) Substantial Understimate of Estimated Tax. - If 80 per centum of the tax * * *, in the case of individuals * * *, exceeds the estimated tax * * *, there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser.↩